# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

JESSIE PILLETTE,

      Plaintiff,

                                  CASE NO. 06-CV-10536

*v.*

                                  DISTRICT JUDGE THOMAS LUDINGTON
                                  MAGISTRATE JUDGE CHARLES BINDER

COUNTY OF OTSEGO, BRIAN WEBER,
NICKOLAS CAVANAUGH, HOLLY
FERGUSON,[1] ELYSE MEYETTE, ERIC
HOFFMAN, AMY MOON and ANDREW
NOBLINSKI,

      Defendants.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
## ON PLAINTIFF'S MOTION TO AMEND COMPLAINT
### (Dkt. 51)
## AND DEFENDANTS' MOTIONS TO DISMISS OR FOR SUMMARY JUDGMENT
### (Dkts. 37, 41, & 57)

## I.      RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Plaintiff's Motion to Amend

Complaint be **DENIED**, that Defendants' Motions to Dismiss or for Summary Judgment be

**GRANTED**, and that the case be **DISMISSED**.

---

[1]This Defendant's name is actually spelled "Furgeson" but has been docketed and will be referred to as "Ferguson." (Dkt. 41.)

## II.    REPORT

### A.    INTRODUCTION

By order of U.S. District Judge David M. Lawson, this prisoner civil rights case was referred to the undersigned Magistrate Judge for general case management on February 21, 2006. (Dkt. 7.)  Pending are four motions:

1) Motion to Dismiss or for Summary Judgment filed by Defendants Andrew Noblinski, County of Otsego, Brian Weber, Nickolas Cavanaugh, Elyse Meyette, and Amy Moon (Dkt. 37);

2) Defendant Holly Ferguson's Motion to Dismiss and for Summary Judgment (Dkt. 41);

3) Plaintiff's Motion to Amend Complaint (Dkt. 51)[2]; and

4) Defendant Eric Hoffman's Motion to Dismiss or for Summary Judgment (Dkt. 57).

After review of the documents, I conclude that, pursuant to E.D. Mich. LR 7.1(e)(2), these motions are ready for Report and Recommendation without oral argument.

### 1.    Background Facts & Record Evidence

Plaintiff is an inmate in the custody of the Michigan Department of Corrections ("MDOC") and is currently housed at the Earnest C. Brooks Correctional Facility in Muskegon, Michigan. The alleged incidents giving rise to his complaint occurred while he was housed at the Otsego County Jail in Gaylord, Michigan.  (Am. Compl., Dkt. 6 at 3.)

Plaintiff acknowledges that he has a long history of mental health issues, including numerous suicide attempts.  (*Id*. at 5.)  The gravamen of his complaint is that the staff at the Otsego County Jail (hereafter "the jail") violated his constitutional rights by being deliberately indifferent to his serious medical and mental health needs and that certain staff members used excessive force

---

[2]Plaintiff previously filed a Motion to Amend Complaint (Dkt. 5) which was granted (Dkt. 9) and Plaintiff filed his first Amended Complaint on February 8, 2006.  (Dkt. 6.)

against him.  He names the following jail officials as defendants:  Brian Webber, a supervising corrections officer in charge of day-to-day operations at the jail; Deputy Nickolas Cavanaugh, said to be in charge of lower-level staff on the midnight shift at the jail; Holly Ferguson, a Community Mental Health ("CMH") social worker in charge of psychiatry referrals; Corrections Officers Elyse Meyette and Eric Hoffman, said to be responsible for supervision of inmates within the jail (*id.* ¶¶ 3-8); and Deputies Amy Moon and Andrew Nobliski, said to be in charge of lower-level staff at the jail.  (*Id.* ¶¶ 9-10.)

Defendants note that when Plaintiff was initially screened, Defendant Moon indicated that Plaintiff appeared to be under the influence of alcohol or drugs but that his behavior "did not suggest a risk of suicide."  (Dkt. 37 at 2; Dkt. 38 at Ex. A.)  Plaintiff indicated he had only attempted suicide when he was a child and refused to answer any questions regarding whether he had been treated for mental health or emotional problems.  (*Id.*)

Plaintiff avers that on September 22, 2003, he cut his wrist in an attempt to commit suicide and told Defendant Meyette, "I missed the good vein this time I'll get the right one next time." (Dkt. 6 ¶ 14.)  Defendants contend that although Plaintiff did make the statement indicated, he added that he was just kidding and that Defendant had used a bottle cap to open up scabs rather than as a suicide attempt.  (Dkt. 37 at 3; Dkt. 38 at Ex. B.)  Despite that incident, Plaintiff states that "[n]o razor restrictions were imposed on the plaintiff, nor was the plaintiff interviewed by community mental health as the plaintiff was advised he would be by Defendant Meyette."  (Dkt. 6 ¶ 15.)  Defendants counter that Plaintiff's bottle cap and razor were removed and that he was referred to a CMH social worker the next day.  (Dkt. 37 at 3; Dkt. 38 at Ex. C.)  Plaintiff denied any suicidal ideation and the social worker did not recommend that Plaintiff be placed on suicide

watch at that time but indicated that if further self-mutilation were to occur, that Plaintiff should be re-evaluated.  (*Id.*)

On September 28, 2003, Plaintiff again "attempted suicide by slicing his wrist with a shaving razor supplied to his persons [sic] by the Otsego County jail . . . [he] received four (4) stitches to the wrist."  (Dkt. 6 ¶ 16.)  After this incident, Defendant Ferguson of CMH "came to interview the plaintiff and gave a written opinion that plaintiff was suffering from 309.4 disturbance of emotion and conduct, but failed to referr [sic] the plaintiff to a psychiatrist adequately trained to treat the emotional breakdown the plaintiff was suffering from."  (*Id.* ¶ 17.) Defendants add that Plaintiff was referred to and seen by CMH, placed on suicide watch and was given a follow up examination by CMH on October 1, 2003.  (Dkt. 37 at 3; Dkt. 38 at Exs. D, E.) On October 1, 2003, Plaintiff indicated that his actions were self-mutilation and not attempted suicide; therefore, the CMH social worker recommended Plaintiff be taken off suicide watch.  (*Id.*)

On October 18, 2003, Plaintiff states that he again "made superficial lacerations to his wrist, arm, and neck" with a shaving razor that was supplied by the Otsego County Jail.  (Dkt. 6 ¶ 18.) Defendants note that Plaintiff was taken to the hospital but did not require any stitches.  (Dkt. 37 at 4; Dkt. 38 at Ex. G.)  Defendants note that upon his return to the jail, he swore at the officers, threatened to urinate on the floor and then did so.  (*Id.*; Dkt. 38 at Ex. F.)  Therefore, Plaintiff was placed in a restraint chair for an hour.  (*Id.*)[3]  Plaintiff states that after this October 18, 2003, incident he was again interviewed by Defendant Ferguson of CMH, but no referrals were made nor were any restrictions regarding razors or other tools placed upon him.  (Dkt 6 ¶ 19.)  Defendants assert and provide documentation to support their assertion that Plaintiff was seen by CMH while

---

[3]Although the exhibit does not indicate the length of time, it was jail policy to leave inmates in the restraint chair for one hour unless indicated otherwise.  (*Id.* at Ex. Q.)

4

he was still in the restraint chair and  that he was housed in an observation cell on suicide watch for nearly two weeks.  (Dkt. 37 at 4; Dkt. 38 at Ex. G.)

On October 20, 2003, Plaintiff was again placed in the restraint chair for one hour and fifteen minutes after he yelled obscenities, intentionally plugged the toilet, refused to unplug it, and resisted the officers' attempts to restrain him.  (*Id.* at 4; Dkt. 38 at Ex. H.)  On that same date Plaintiff was again seen by CMH and although Plaintiff indicated he did not have any suicidal ideation, he was kept on suicide watch pursuant to the CMH recommendation.  (*Id.* at 4.)

On October 24, 2003, Defendants state that Plaintiff threw feces from his toilet down the jail hallway and yelled, "How does my sh_t smell minimum [security]?"  (*Id.* at 4; Dkt. 38 at Ex. I.)  Plaintiff was interviewed by CMH on that date and after the CMH social worker consulted with a psychiatrist, it was determined that Plaintiff should remain on suicide watch until October 31, 2003.  After a CMH follow-up session, it was recommended that Plaintiff be removed from suicide watch.  (*Id.*)

On November 4 and 5, 2003, Defendant notes that Plaintiff was seen attempting to throw feces at his cellmates.  (*Id.* at 5; Dkt. 38 at Ex. J, K.)   On November 19, 2003, Plaintiff requested a referral to a psychiatrist for "the severe depression the plaintiff was suffering from."  (Dkt. 6 ¶ 20.)  Plaintiff alleges that Defendants Ferguson and Webber spoke with one another and "decided that the plaintiff was not mentally ill and in no need of CMH services," so Defendant Ferguson denied Plaintiff's request for a mental health care referral.  (*Id.* ¶ 21.)  Defendants concur that Plaintiff was referred to CMH and CMH did not find he was mentally ill or in need of any services at the time.  (Dkt. 37 at 5.)  Defendants counter that Plaintiff completed a Mental Health Referral form that day indicating that the nature of his problem was "everything you try losing and facing

life for something you didn't do." (Dkt. 37 at 5; Dkt. 38 at Ex. L.) In addition, Plaintiff completed a Resident Complaint form that day. (*Id.* at 5; Dkt. 38 at Ex. M.)

On November 24, 2003, Plaintiff states he again attempted suicide by "slicing his wrist with an [sic] shaving razor supplied to his persons [sic] by the defendant Otsego County." (Dkt. 6 ¶ 22.) Plaintiff was taken to the Otsego Memorial Hospital and received eighteen (18) stitches to his wrist. (*Id.* ¶ 23.) Defendant Ferguson "then made the referral to an expert as requested previously by the plaintiff, claiming the the [sic] plaintiff was suffering from possible border line traits." (*Id.* ¶ 25.) Under Defendants' version of the events, Plaintiff was cited for throwing his food and garbage onto the catwalk several times that day. (Dkt. 37 at 5; Dkt. 38 at Ex. N.) Defendants confirm that Plaintiff cut his left arm and that he was taken to the hospital and his arm was stitched. (*Id.*; Dkt. 38 at Ex. O.) When Plaintiff returned from the hospital, he was placed on suicide watch and was seen by CMH. (*Id.*) When seen again by CMH on November 26, 2003, CMH determined that he was not psychotic and recommended that he be taken off suicide watch and returned to ordinary status. (*Id.*)

"On December 21, 2003, Plaintiff states that defendants Meyette, and Moon, with permission of their superior officer defendant Cavanaugh, placed the plaintiff into the restraint chair with direct knowledge of the plaintiff being prescribed Cipro for frequent urination and possible kidney infection, until the plaintiff urinated on himself three (3) times in a row." (*Id.* ¶ 30.) Defendants note that on December 21, 2003, Plaintiff intentionally flooded the holding cell, booking area and trustee cell with between two and four inches of water. (Dkt. 37 at 6; Dkt. 38 at Ex. P.) Plaintiff stated that his inmate trustees refused to give him toilet paper but the trustees claimed Plaintiff had gotten his toilet paper wet and thrown it at them. (*Id.*) When Plaintiff was told to mop the water up, he threw the mop, returned to his cell and threw things around his cell

and out of his cell. (*Id.*) He tied his sheets and clothes that he had ripped to pieces onto the cell bars, he kicked the window and began banging the telephone on the cell bars. The officers consulted with the shift supervisor and placed Plaintiff in the restraint chair. (*Id.*) Plaintiff tried to loosen the straps by rotating his wrists, rubbing his wrists until they were raw, and he yelled loudly that he had urinated in his pants. He was removed less than two hours after he was placed in the chair. He was offered but refused fresh clothes and instead masturbated in front of the officers while asking them if they liked it. (*Id.*) Several hours later, Plaintiff began screaming and banging the telephone on the cell bars again so he was placed in the restraint chair for one hour. (*Id.*; Dkt. 38 at Ex. Q.)

On February 2, 2004, Defendants recall that Plaintiff threatened an inmate and spit on him. (Dkt. 37 at 6; Dkt. 38 at Ex. R.) On February 7, 2004, Plaintiff threatened to throw urine at a fellow inmate. (*Id.*, Dkt. 38 at Ex. S.) On February 8, 2004, Plaintiff yelled obscenities and threatened to throw feces on the staff and inmates. (*Id.*, Dkt. 38 at Ex. T.)

Plaintiff contends that although he was initially scheduled to meet with a psychiatrist in mid-February of 2004, upon arriving at Northern Michigan's Community Mental Health Center on February 14, 2004, Plaintiff was informed by Officer John Dye that his appointment was cancelled. (Dkt. 6 ¶ 27.) When Plaintiff asked Defendant Ferguson why the appointment was cancelled, she responded, "'because we thought you would be in prison already.'" (*Id.* ¶ 28.)

On February 24, 2004, Plaintiff avers that Defendants "Meyette, Hoffman, Moon, and Nobliski placed the plaintiff into a restraint chair after defendant Meyette use[d] an excessive amount of tear gas on the plaintiff merely for yelling aloud." (Dkt. 6 ¶ 29.) Defendants describe that on February 24, 2004, Plaintiff had been repeatedly asked to stop kicking the door and being disruptive, Plaintiff refused so the officers decided to remove his property from the cell. (Dkt. 37

at 7; Dkt. 38 at Ex. U.)  When the officers entered his cell, Plaintiff would not step back from his bunk as asked so Plaintiff was placed against the wall; Plaintiff threatened the officer and "got in his face," so the officer handcuffed Plaintiff and took him to a holding cell.  (*Id.*)  Once in the holding cell, Plaintiff's handcuffs were removed, at which time he began shouting and swearing at the officers.  (*Id.*)  After approximately fifteen minutes, Plaintiff told the officers that he would hurt himself, began punching the window with his fist, kicking the bars, and banging the telephone on the bars, so the officers placed Plaintiff in the restraint chair.  (*Id.*)  Plaintiff resisted going in the chair and was restrained by a technique Defendants refer to as "hard intermediate hand control."  (*Id.*)  Plaintiff refused to place his hands in the restraints so a "soft empty hand control/pressure point" technique was used.  Plaintiff continued to refuse to comply so three short sprays of a "soft intermediate weapon control," i,e., an aerosol spray, were used.  (*Id.*)  Plaintiff was in the chair for less than fifteen minutes, after which he was permitted to rinse his eyes and nose.  (*Id.*)  Plaintiff then calmed down and was not placed back in the chair.  (*Id.*)

On February 26, 2004, Plaintiff completed a grievance form asking to see the doctor and he was seen by the doctor.  (Dkt. 37 at 8; Dkt. 38 at Ex. V.)  Plaintiff contends that the doctor at Gaylord Family Practice prescribed medication for peeling skin around his eyes but that he was never actually given the medication.  (*Id.* ¶ 31.)  Although Plaintiff did file a grievance, he contends that he was unable to file grievances (Dkt. 6 ¶ 32), that "Otsego County has no grievance procedure or policy in effect," and that he attempted to exhaust remedies by sending a complaining or grieving letter to Otsego County Sheriff James McBride but that he received no response. (*Id.* ¶¶ 33-34.)  He contends that these actions denied him due process and access to the courts in violation of the First and Fourteenth Amendments. (*Id.*)

Plaintiff contends that all of the above actions reveal deliberate indifference to his medical needs or cruel and unusual punishment in violation of the Eighth Amendment and amounted to state law torts of negligence and assault and battery for excessive force. (*Id.* at 3, "preliminary statement.") Plaintiff seeks a declaratory judgment, "compensatory damages in excess of $10,000 in the amount that plaintiff is found to be entitled" and "punitive damages in the amount that plaintiff is found to be entitled in excess of $10,000." (*Id.* at 12-15.)

### 2.    Motion Standards

Defendants seek dismissal under Rule 12(b) of the Federal Rules of Civil Procedure or, in the alternative, summary judgment under Rule 56. Rule 12(b) provides that when "matters outside the pleading are presented to *and not excluded by the court*, the motion [to dismiss] shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." FED. R. CIV. P. 12(b) (emphasis added). In their treatise, Wright and Miller explain that, pursuant to the portion of the rule italicized above,

> [t]he court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion. This discretion generally will be exercised on the basis of a determination of whether or not the proffered material, and the resulting conversion from the Rule 12(b)(6) to the Rule 56 procedure, is likely to facilitate the disposition of the action.

5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366 (footnote omitted).

Defendants have filed a series of exhibits with their briefs. These documents are relevant to the arguments and worthy of review and consideration. The Court therefore finds that the matters outside the pleadings presented by Defendants should be accepted and the motion considered as one under Rule 56, as the acceptance and review of these documents will materially

facilitate the disposition of the instant motion. Further, Plaintiff has had ample time to respond to the submission of these documents and has not done so, thereby eliminating any concern of prejudice. I will therefore consider Defendants' motion under the standards for the determination of a Rule 56 motion for summary judgment.

A motion for summary judgment will be granted under Rule 56(c) where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In response, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the nonmoving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will

rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). The Sixth Circuit has explicitly instructed that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406.

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### 3.    Summary of the Parties' Arguments

Defendants Otsego County, Webber, Cavanaugh, Meyette, Moon, and Nobliski (the "County Defendants") argue that Plaintiff's complaint should be dismissed because Plaintiff failed to exhaust administrative remedies, his claims are barred by qualified immunity, he has not met his burden to show that an Otsego County policy or custom caused his injuries, and that his state law claims are barred by Michigan governmental immunity. (Dkt. 37 at I.)

Defendant Eric Hoffman adopts the arguments and exhibits advanced by the County Defendants. (Dkt. 57 at 1.)

Defendant Ferguson contends that Plaintiff's medical care was not constitutionally deficient, that Defendant is entitled to qualified immunity, that the state law claims are barred by Michigan governmental immunity, and also adopts the arguments set forth in the brief of the County Defendants. (Dkt. 41 at 1-2.)

**B.     LAW & ANALYSIS**

**1.     Eighth Amendment Claims Against Individual Defendants**

**a.     Medical Treatment**

The Eighth Amendment to the U.S. Constitution protects convicted inmates from the imposition of "cruel and unusual punishments." U.S. CONST. amend. VIII.  In the context of prison medical treatment, the Supreme Court held in *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976), that the deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain in violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment.  The Court explained that "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.* at 106.  Thus, mere inadequate medical treatment is not sufficient to state a violation of the Eighth Amendment.  In *Estelle,* 429 U.S. at 105, the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. **Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.** In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105-06 (emphasis added) (quotations omitted).

Consequently, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are insufficient to state a deliberate indifference claim." *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995).  The Sixth Circuit

distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id. See also Jones v. Martin*, 5 Fed. Appx. 434 (6th Cir. 2001).

A violation of the Eighth Amendment can occur if it "is manifested by prison doctors and their response to prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104. The inquiry is two-pronged, consisting of both an objective and a subjective element. *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991). The objective inquiry asks whether the deprivation was sufficiently serious. *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992). The *Caldwell* court found that the plaintiff-prisoner "did not suffer a serious deprivation because his injuries were not serious enough to require immediate medical attention." *Id.*

A medical need is sufficiently serious if "facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 898 (6th Cir. 2005). However, "[t]his 'obviousness' standard for determining a serious medical need is distinct from a separate branch of Eighth Amendment decisions where the seriousness of a prisoner's medical needs 'may also be decided by the *effect* of delay in treatment.'" *Id.* (emphasis in original).

The subjective component asks whether the officials acted with a sufficiently culpable state of mind. *Id.* The plaintiff must show that the defendant's conduct demonstrated a level of

deliberateness "'tantamount to an intent to punish.'"  *See Hicks v. Frey*, 992 F.2d 1450, 1455 (6th Cir. 1993) (quoting *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988)).  In 1994, the Supreme Court further explained this element "by equating it with criminal recklessness, which requires a subjective showing that the defendant was aware of the risk of harm."  *Sanderfer*, 62 F.3d at 154 (citing *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994)).  In *Farmer,* the Court specified that for a government official to be deliberately indifferent, he "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  Finally, the government official must have "disregarded that risk."  *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).  These same standards apply to mental health as well as physiological medical needs.  *See id.* (prisoner suicide case).

In the instant case, although Plaintiff contends that Defendants did not adequately respond to his mental health needs, specifically his suicide attempts, the record evidence shows otherwise.  After each potential suicide attempt (or self-mutilation), Plaintiff was seen by a CMH worker or a psychiatrist.  (Dkt. 38 at Ex. C, D, E, G, & I.)  In addition, the records show that Defendants promptly addressed the self-inflicted physical injuries by taking Plaintiff to the local hospital each time he suffered some injury, even when Plaintiff recognized the injury was "superficial."  (*Id.* at Ex. G, O; Dkt. 6 ¶¶ 18, 23.)  Finally, although Plaintiff alleged in his complaint that Defendants failed to place any "razor restrictions" on him (Dkt. 6 ¶¶ 15, 19), the record evidence indicates to the contrary (Dkt. 38 at Ex. C, D, E, G) and Plaintiff has failed to come forward with any "significant probative evidence" to controvert the Defendants' records and show that there is a genuine issue for trial.  *See Moore, supra,* 8 F.3d at 340.

I suggest that Plaintiff's averments do not manifest a meaningful allegation of inadequate medical care, let alone deliberate indifference of a serious medical need. *Estelle, supra; Westlake, supra.* Therefore, I suggest that Plaintiff has failed to present evidence to support a claim for an Eighth Amendment violation based on medical care. *Wilson, supra; Blackmore, supra; Street, supra; Guarino, supra.*

      **b.     Prison Order and Discipline**

In this context, Plaintiff must prove an unnecessary and wanton infliction of pain or the infliction of pain without penological justification. *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981). Under the objective inquiry in this context, the question is whether "contemporary standards of decency" have been violated. *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Id.* Thus, a prisoner need not prove a significant injury. *Moore v, Holbrook*, 2 F.3d 697, 701 (6th Cir. 1993). Under the subjective component, the inquiry involves "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986). Toward that end, "officials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force." *Hudson*, 503 U.S. at 6. Courts should consider that "corrections officials must make their decisions 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.* (quoting *Whitley,* 470 U.S. at 320.) The factors to be analyzed when considering the conduct of prison officials are: 1) the need for the application of force, 2) the relationship between the need for force and the amount used, 3) the threat reasonably perceived by the responsible

15

officials, 4) any efforts made to temper the severity of the forceful response, and 5) the extent of the injury inflicted. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321. This analysis must be made in harmony with the Supreme Court's admonition that the courts should defer to prison officials as they attempt to maintain order and discipline within dangerous institutional settings. *Whitley*, 475 U.S. at 321-22.

In the instant case, Plaintiff complains because he was placed in the "restraint chair" on several occasions. However, I suggest that the record evidence demonstrates that use of the chair was justified by the circumstances. The restraint chair was only used after other attempts to restrain or calm Plaintiff failed, when Plaintiff had threatened to or did use bodily waste as a weapon, after he had plugged the toilet, flooded the jail, refused to clean up and stop throwing things out of his cell or smashing the telephone, or refused to calm down and stop yelling obscenities. (Dkt. 38 at Ex. F, H, P, Q.) The only other reason for employing the restraint chair was to prevent Plaintiff from harming himself. (Dkt. 38 at Ex. U.) Even when placed in the restraint chair, Plaintiff was not left in the chair for more than two hours. (*Id.* at Ex. F (1 hour),[4] Ex. H (1 hour, 15 minutes), Ex. P (1 hour, 55 minutes), Ex. Q (1 hour), Ex. U (15 minutes).) The evidence further reveals that the officers refrained from placing Plaintiff in the restraint chair on several occasions where they could have justifiably done so. (Dkt. 38 at Exs. J, K (throwing feces at cellmates); Ex. R (spit on an inmate); Ex. S (threatening to throw urine on an inmate), Ex. T (threatening to throw feces on staff and inmate).)

Plaintiff also complains about unnecessary chemicals that were used on him. The aerosol spray, i.e., "soft intermediate weapon control," was only employed in one instance when Plaintiff

---

[4]Although the Exhibit does not indicate the length of time, it was jail policy to leave inmates in the restraint chair for one hour unless indicated otherwise. (*Id.*, Ex. Q.)

16

had threatened the officers and after other efforts to restrain Plaintiff, such as hand and pressure point control, had failed. (Dkt. 38 at Ex. U.) Defendants then allowed Plaintiff to rinse his eyes and nose after his fifteen minutes in the restraint chair. (*Id.*) Once Plaintiff calmed down, he was not placed back in the chair. (*Id.*)

I suggest that the evidence in the record reveals that Defendants were cautious in attempting other means before using any restraint or force and that when they did, it was proportional to the level of resistence or danger posed by the Plaintiff's actions. Plaintiff does not even aver any malicious infliction of injury. Thus, I suggest that the prison officials are entitled to summary judgment on the Eighth Amendment claim based on prison order and discipline. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Street, supra; Guarino, supra. Compare Hartsfield v. Vidor*, 199 F.3d 305 (6th Cir. 1999) (finding that Eighth Amendment was not violated where prisoner punished for damaging his cell by being kept in restraints for two eight-hour periods where he was denied fresh water and use of the toilet); *Key v. McKinney*, 176 F.3d 1083 (8th Cir. 1999) (finding no Eighth Amendment violation where after plaintiff threw water on corrections officer he was restrained in handcuffs and leg shackles for 24 hours where he was checked on periodically and even though the shackles made it more difficult for him to sleep and relieve himself); and *Jarrett v. Bouchard*, 2006 WL 2632460 (W.D. Mich. Sept. 13, 2006) (finding no Eighth Amendment violation where plaintiff was restrained and his jaw was injured as a result of the restraint after he attempted to spit on defendants as they were removing him from the shower stall and where officer kicked the food slot door closed on plaintiff's hand, injuring his thumb, because there was no evidence that the officer did so intentionally); *with Pelfrey v. Chambers*, 43 F.3d 1024, 1037 (6th Cir. 1995) (holding that Eighth Amendment was violated where officer assaulted plaintiff for "absolutely no reason"); *Hadix v. Caruso*, 461 F. Supp. 2d 574, 596 (W.D. Mich. 2006) (holding

17

that use of in-cell mechanical restraints, including "top of the bed" restraints that chained the prisoner's hands and feet to a concrete slab for punitive reasons, correction, to prevent in-cell disruption, in-cell destruction of property, or observation other than by physicians or psychiatrists is prohibited under the Eighth Amendment, notwithstanding the six-hour limit).

Furthermore, I believe that had Defendants not responded to Plaintiff's proclivity to toss human waste about, they may have been subject to suits from other inmates. Exposure to human waste presents grave health risks and violates the general standards of decency. *See, e.g.*, *McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001); *McCord v. Maggio*, 927 F.2d 844, 848 (5th Cir. 1991).

To the extent that Plaintiff seeks damages for "emotional injuries" (Dkt. 6 ¶ C.3; "for emotional injury sustain [sic] as a result of the excessive use of restraints . . . " ), I suggest that Plaintiff has failed to plead a claim that meets the Prison Litigation Reform Act's requirement that any action for emotional injury suffered while in custody is barred unless the prisoner can show physical injury. 42 U.S.C. § 1997(e). The physical injury need not be significant, but it must be more than *de minimus* for an Eighth Amendment claim to proceed. *Adams v. Rockafellow*, 66 Fed. Appx. 584, 586 (6th Cir. 2003) (citing *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997)).

### 2.    Access to the Courts Claim Against Otsego County

Plaintiff also averred that "Otsego County has no grievance procedure or policy in effect" and that, as a result, he was unable to exhaust administrative remedies and such failure could potentially deny him access to the courts. (Dkt. 6 ¶¶ 32-34.)[5] Plaintiff's claim is again defeated

---

[5]At the time Plaintiff filed his complaint the law of this Circuit required a plaintiff to prove he had exhausted administrative remedies. After *Jones v. Bock*, _ U.S. _, 127 S. Ct. 910, _ L. Ed. 2d _ (2007), the affirmative defense of failure to exhaust must be plead and proven by defendants.

18

by the evidence which shows that Plaintiff did file grievances so the procedure was available and

Plaintiff knew how to utilize it.  (Dkt. 38 at Ex. V, M.)

This claim must also fail because he has not alleged that he suffered any prejudice to his

legal work.  *Lewis v. Casey*, 518 U.S. 343, 355, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996)

(prisoner must demonstrate actual prejudice to pending or contemplated litigation to state a claim

for denial of constitutional right of meaningful access to the courts).

### 3.    State Law Tort Claims Against Individual Defendants

### a.    Governmental Immunity

Immunity of governmental employees under Michigan law is statutorily provided for as

follows:

> Each . . . employee of a governmental agency . . . shall be immune from tort liability
> for injuries to persons or damages to property caused by the . . . employee . . . while
> in the course of employment . . . while acting on behalf of a governmental agency
> if all of the following are met:
> (a)    The . . . employee . . . is acting or reasonably believes he or she is acting
>        within the scope of his or her authority.
>
> (b)    The governmental agency is engaged in the exercise or discharge of a
>        governmental function.
>
> (c)    The . . . employee's . . . conduct does not amount to gross negligence that is
>        the proximate cause of the injury or damage.  As used in this subsection,
>        'gross negligence' means conduct so reckless as to demonstrate a substantial
>        lack of concern for whether an injury results.

MICH. COMP. LAWS § 691.1407(2).  I suggest that none of the allegations give rise to a claim that

could undermine immunity.

### b.    Assault and Battery

"An assault is defined as any intentional unlawful offer of corporal injury to another person

by force, or force unlawfully directed toward the person of another, under circumstances which

19

create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. App. 1991). A battery is defined as "the wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Id.*

In Michigan, governmental employees are not shielded from liability for intentional torts, including assault and battery. *Sudul v. Hamtramck*, 562 N.W.2d 478 (Mich. App. 1997). However, where the governmental employee's actions are objectively reasonable under the circumstances, the employee is able to rely on governmental immunity for what would otherwise be an intentional tort had the action not been justified. *See VanVorous v. Burmeister*, 687 N.W.2d 132 (Mich. App. 2004); *Brewer v. Perrin*, 349 N.W.2d 198 (Mich. App. 1984); *Smith v. Michigan*, 333 N.W.2d 50 (Mich. App. 1983).

For the reasons stated above under the Eighth Amendment, First, and Fourteenth Amendment claims, I suggest that the record evidence reveals no genuine issue of disputed fact that the governmental employees acted reasonably and therefore are entitled to immunity on this assault and battery claim. *VanVorous, supra*.

  **c.**  **Negligence**

Plaintiff does not even aver gross negligence but mere ordinary negligence. (Dkt. 6 at 3.) Governmental actors are immune from negligence suits and are liable only for gross negligence. Even if Plaintiff had alleged gross negligence, claims of intentional torts may not be couched in terms of gross negligence and thereby "converted" into a separate claim under Michigan law. *VanVorous*, 262 Mich. App. at 483-84. Since Plaintiff's claim for (gross) negligence merely recasts the alleged constitutional violations and torts in terms of violating Defendants' duty to

avoid such behavior, I suggest that this claim does not merit separate consideration under Michigan law and that summary judgment should be granted as to this claim as well.

### 4.      Motion to Amend Complaint (Dkt. 51)

When a party wishes to amend a pleading after the opposing party's responsive pleading has been served, it may only do so by leave of court or by written consent of the adverse party. FED. R. CIV. P. 15(a).  When a motion for leave to amend is before the court, Rule 15(a) provides that "leave shall be freely given when justice so requires." *Id.*  "Although Rule 15(a) indicates that leave to amend shall be freely granted, a party must act with due diligence if it intends to take advantage of the Rule's liberality," *United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995), because, despite the Rule's liberality, leave to amend "is by no means automatic." *Little v. Liquid Air Corp.*, 952 F.2d 841, 845-46 (5th Cir. 1992).  The decision to grant or deny a motion to amend pleadings is left to the sound discretion of the district court.  *Robinson v. Michigan Consol. Gas Co., Inc.*, 918 F.2d 579, 591 (6th Cir. 1990).

> When determining whether to grant leave to amend, the court is to consider several factors:
>
> Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision.  Delay by itself is not sufficient reason to deny a motion to amend.  Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted.

*Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989) (quoting *Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973)).  In addition to these factors, courts must also take into account whether the moving party is seeking to add claims or to add parties, because amendments seeking to add claims are generally granted more freely than amendments adding parties.  *Union Pac. R.R. Co. v. Nevada Power Co.*, 950 F.2d 1429, 1432 (9th Cir. 1991).

Plaintiff previously filed a Motion to Amend Complaint (Dkt. 5) which was granted (Dkt. 9), and Plaintiff filed his first Amended Complaint on February 8, 2006. (Dkt. 6.) Plaintiff now seeks to amend in order to sue Defendants Otsego County, Brian Webber, and Nicholas Cavanaugh in their individual capacities because the "individual and" official capacity language was omitted from the paragraphs concerning those three Defendants. (Dkt. 51 ¶ 2; Dkt. 6 ¶¶ 4, 5, 6.) Defendants argue that Plaintiff's requested amendments are futile. (Dkt. 55.)

Futility of amendment may be found if defendants can show that the proposed amendments will not cure the failures for which the court is granting a pending dispositive motion. *Miller v. Calhoun County*, 408 F.3d 803, 817 (6th Cir. 2005). As discussed earlier, I suggest that the record evidence demonstrates that there is no genuine issue of material fact in dispute with regard to whether Plaintiff's medical and mental health needs were met with deliberate indifference or whether Plaintiff was handled with excessive force. In other words, the evidence is simply so "one-sided that one party must prevail as a matter of law." *Booker, supra,* 879 F.2d at 1310. Since the proposed amendments will not alter that recommendation, I further suggest that the proposed amendments are futile and that Plaintiff's motion to amend should be denied.

### 5.    Conclusion

For the reasons stated above, I suggest the Defendants' motions to Dismiss or for Summary Judgment be granted and that all Defendants are entitled to dismissal of all claims against them because Plaintiff has failed to come forward with evidence supporting the elements of his Eighth Amendment claims, First and Fourteenth Amendment claim, and because he has failed to support his state law tort claims with any evidence undermining state governmental immunity. I also suggest that Plaintiff's Motion to Amend Complaint be denied as justice does not require it since any amendment would be futile.

**III.    REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.


 s/ *Charles E. Binder*  
CHARLES E. BINDER  
Dated: February 27, 2007                United States Magistrate Judge


**CERTIFICATION**

I hereby certify that this Report And Recommendation was electronically filed this date, electronically served on Jason Kolkema and Bradley Wierda, served on Jessie Pillette by first class mail, and served on District Judge Ludington in the traditional manner.


Date:  February 27, 2007                By____s/Jean L. Broucek_____  
                                        Case Manager to Magistrate Judge Binder